Gabriel Capó Cintrón et al., Plaintiffs and Appellees, *v.* A. Hartman & Co. et al., Defendants and Appellants.

No. 7529. Argued November 21, 1939.—Decided June 28, 1940.

*Jorge L. Córdova* and *Carlos J. Torres* for appellants. *José A. Poventud* and *Eduardo Capó Cintrón* for appellees.

Mr. Justice De Jesús delivered the opinion of the court.

In an action brought, in the District Court of Guayama, by Doña Rosario Cintrón Sánchez, widow of Capó, against the commercial partnership of A. Hartman & Co., judgment was rendered on September 27, 1921, in favor of the plaintiff, adjudging her to be the owner of two properties of 42 and 38 acres *(cuerdas)* respectively, which for several years prior to June 1, 1918, the date when the defendant was summoned, had been detained by the latter against the will and notwithstanding the various demands of the plaintiff. Said judgment was affirmed by this court on February 26, 1925 (*Cintrón* v. *A. Hartman & Co.*, 35 *D.P.R.* 1070), and also by

the U. S. Circuit Court of Appeals for the First Circuit on June 8, 1926 (12 F. (2d) 649).

After the death of Doña Rosario Cintrón which occurred on January 24, 1927, and before a year had elapsed since the rendition of the judgment of the Circuit Court of Appeals that terminated the action of revendication, on or about May 28, 1927, her testamentary heirs brought this action to recover the rents and profits received by the defendants and those which the plaintiffs or their predecessor in interest might have received during the time that the defendant partnership possessed in bad faith the said properties, to wit, since before January 1, 1917, until June 25, 1920 (original amended complaint, par. 8; judgment roll, p. 5).

It seems advisable to state here that, although the judgment of the Circuit Court putting an end to the action of revendication was rendered on June 28, 1926, the claim for rents and profits was limited to June 25, 1920, due to the fact that while said action was still pending the said properties were sold by A. Hartman & Co. to another entity.

The present action for the recovery of rents and profits was brought against the said partnership, and as it was alleged that the latter had no property, there were joined as defendants its members, the husbands of two of the partners, and the heirs of the deceased partners, Doña Adelina or Axelina Murdock de McCormick and Doña Sara Noble Ruiz de McCormick. Judgment was demanded against the defendants jointly and severally for the sum of $101,710, which the plaintiffs estimated to be the value of the fruits collected or that might have been collected, with costs.

On June 14, 1933, by leave of court there was filed a supplemental complaint the allegations of which need not be recited in this opinion.

After various incidents and the holding of a trial during March 28, September 11 and 12, October 11 and 25, November 8 and 29, December 13 and 20, 1935, and January 24 and 31, 1936, the said District Court of Guayama, on September 1,

1936, rendered a judgment, which was clarified two days later upon motion of the plaintiffs, adjudging the defendants to pay jointly and severally to the plaintiffs the sum of $26,958.26 as the net amount or value of the rents and profits produced by the above-mentioned properties, together with costs, including attorney's fees of the plaintiffs which were fixed at $7,000.

From that judgment an appeal was taken by the defendants Palmira McCormick Murdock and her husband Rafael Shuck; Chloris McCormick Murdock, on her own behalf and as mother with *patria potestas* of her minor daughter Axelina McKinley McCormick, Idalia McCormick Murdock, and her husband Enrique Calimano Díaz, and Carlos R. McCormick Murdock.

The appellants have submitted two separate briefs: one on behalf of Palmira McCormick Murdock which was subscribed by Attorney Jorge L. Córdova, and another on behalf of Chloris, Idalia, and Carlos R. McCormick Murdock, Enrique Calimano, and Axelina McKinley McCormick, which was subscribed by Attorney Carlos J. Torres.

The errors assigned in both briefs will be considered jointly in the course of this opinion.

The appellants represented by Attorney Carlos J. Torres maintain that the lower court erred in ordering the striking out of paragraphs 3, 4, 5, and 6 of the answer to the complaint which, in brief, alleged:

(3) That in case judgment is rendered against the defendants the same should be limited to $300 a year which was the rent that the lessee of the property, Genaro Cautiño Insúa, paid to A. Hartman & Co. during the period from June 1917 to June 1, 1920.

(4) That the action for the recovery of rents and profits is barred.

(5) That the right to recover rents and profits was waived by the predecessor in interest of the plaintiffs in failing to claim them within the action of revendication.

(6) That as the judgment rendered in the action of revendication contains no declaration regarding the existence of bad faith on the part of A. Hartman & Co., there is a presumption in its

favor that it was a possessor in good faith and therefore it is not bound to return any fruits. (Brief, pp. 8–10.)

Section 104 of the Code of Civil Procedure in its present form and as it was in force at the time of the commencement of the action of revendication, in its pertinent part provides thus:

"Section 104.—The plaintiff may join several actions in one complaint, where they all arise out of:
"1.     *     *     *     *     *     *     *
"2. Claims to recover specific real property, with or without damages for the withholding thereof, or claims for waste committed thereon, and for the rents and profits of such property."

The above-cited provision admits of no other interpretation than that it is discretionary with the plaintiff to join several causes of action. This being so, and as two distinct causes of action are involved—that of revendication and that for the recovery of rents and profits, the latter being independent of the former although subsidiary thereto—the exercise by the plaintiff in the action of revendication of her right not to join with that action one for recovery of rents and profits, does not at all imply a waiver of the right to bring the latter action separately.

So that the plaintiff has his election of two alternatives, namely, to join the subsidiary action for the recovery of rents and profits with the principal action of revendication; or to institute the latter action only and enforce the claim for rents and profits by a separate suit; but in the latter case the suit can not be brought until there is a final *(firme)* judgment of recovery in favor of the plaintiff in the action of revendication. This is so, because the right to recover rents and profits depends upon the ownership by the plaintiff of the property involved; and until such ownership has been established, the plaintiff is not entitled to claim them. *Locke* v. *Peters,* 65 Cal. 161.

In the case of *New Orleans* v. *Gaines,* 82 U.S. 624, cited with approval by this court in *Ruiz et al* v. *Mercado & Sons,*

38 P.R.R. 525, 531, the Federal Supreme Court, in construing similar provisions of the Civil Code of Louisiana said:

"The remaining question to be considered is upon the allowance of the plea of prescription. It is alleged as error that the plea of prescription was not allowed in bar of the claim for all the rents and profits which had accrued more than three years prior to the commencement of the action. The Civil Code enumerates as causes of action which are the subject of the prescription of three years—'the action for arrearages of rent charge, annuities, and alimony, or of the hire of movables or inmovables.' (Article 3503.) 'In general all personal actions except those above enumerated are prescribed by ten years, if the creditor be present, and by twenty years if he be absent.' (Article 3508.)

"These articles do not govern the present case. They prescribe actions which the party had the legal right to bring. They do not apply to rights like the present, which result from the determination of another action. Until the decreee in the main suit there was here no existing cause of action to recover the mesne profits. No special action could be maintained for them until the title to the property should be judicially determined. It is controlled rather by the title 'Of the Right of Accession to what is produced by the thing.'

" 'Fruits of the earth, whether spontaneous or cultivated, belong to the proprietor by right of accession.'

" 'The fruits of the thing belong to its owner, although they may have been produced by the work and labor of a third person or from seeds sown by him, on the owner's reimbursing such person for his expenses.'

" 'The produce of the thing does not belong to the simple possessor and must be returned with the thing to the owner who claims the same, unless the possessor held it *bona fide.*'

"Speaking strictly, there was not only no cause of action, but no right to the mesne profits until the judgment in the original suit."

A similar view is expressed by Manresa when he says:

". . . . there is, then, no basis for setting up prescription until the time for the exercise of the action has arrived, that is, until there is an effective judgment declaring the obligation which is to be enforced. . ." 12 Manresa, *Comentarios al Código Civil*, 3d ed. (1907), p. 879.

We have already seen that the action of revendication was definitely decided by the Circuit Court of Appeals on June 8, 1926, and that the complaint in the action claiming rents and profits was filed on May 28, 1927, that is, within one year from the time when the plaintiffs could legally enforce the claim.

Whatever may be the applicable limitation period, the conclusion is unavoidable that when the action for the recovery of rents and profits was commenced the shorter period of prescription—one year—had not yet expired. It is evident that the action was not barred at the time it was brought.

As the action of revendication had been instituted separately; the good or bad faith of the defendant was not in issue therein, and no pronouncement on that point could lawfully have been made in the judgment which was rendered in favor of the plaintiff in that case. Therefore, the lack of such a pronouncement does not create any inference or presumption as to good faith in favor of the defendant.

In the action of revendication it was fully established that the defendant A. Hartman & Co. occupied the two properties of the plaintiff without any title. It is also an uncontroverted fact that said properties were recorded in the name of the plaintiff, that of 38 acres, since 1891, at page 2, volume 71 of Guayama, property No. 799, inscription 33; and that of 42 acres, which was acquired in the year 1868, at page 154, volume 39 of Guayama, property No. 1940.

Section 363 of the Civil Code, 1930 ed., defines a possessor in good faith by saying that it is one who is not aware of any flaw in his title or in the manner of its acquisition by which it is invalidated. Manresa, in commenting on a similar provision of the Spanish Civil Code (section 433), says:

"Section 433 provides: 'Every person who is unaware of any flaw in his title or in the manner of its acquisition by which it is invalidated, shall be deemed a possessor in good faith.' According to

this definition, in order that good faith may exist, it is indispensable that there should be: (1) a title or mode of acquisition; (2) flaws in said title or mode; (3) ignorance of said flaws by the possessor, and as an immediate consequence thereof, a reasoned belief on his part that the thing or right possessed belongs to him.'' Manresa, *Comentarios al Código Civil* (1910 ed.), vol. 4, p. 93.

If, as we have seen, A. Hartman & Co. had no title to the properties in question; if, as the evidence shows, ever since the year 1891, the date of the most recent record, the properties were recorded in the name of plaintiffs' predecessor in interest; and if it be considered, further, that since before 1917 Doña Rosario Cintrón, acting personally and through her sons, Gabriel and Eduardo Capó, and her attorney, Francisco Parra Capó, Esq., had made repeated demands upon the managing partners of the defendant for the return of the properties, which she claimed as belonging to her exclusively, how can they successfully set up their good faith?

It is argued that in the judgment rendered by this court affirming that of the District Court of Guayama in the action of revendication, two of the justices dissented and said judgment was rendered without costs, and it is maintained that these two circumstances show that this court found no bad faith in the possession held by the defendant. As we have already stated, the good or bad faith of such possession by the defendant was not in issue in said action. There the only issue involved was as to whether the properties belonged to the plaintiff or to the defendant. Consequently, in relieving the latter from the payment of costs the question of whether the possession of the defendant was in good or bad faith could not have been present in the mind of the court. It might be argued to the contrary that the district court imposed costs on the defendant and that the Circuit Court of Appeals did not confine itself to an affirmance of the judgment of this court but awarded costs against the appellant (Op., p. 652) and, in referring to the dissent of the two justices of this court, said:

198

"It is true that two of the justices dissented; but this court is without the benefit of any opinion by them, showing the grounds of their dissent." (Op., p. 651.)

The evidence shows that during the period for which rents and profits are claimed, the two properties had been leased to A. Hartman & Co. by Genaro Cautiño Insúa for a total rent of $300 a year. The appellants argue that in case judgment should be rendered against the defendants the amount thereof should be limited to $300 a year, which was the amount received by the defendant as fruits of the properties by reason of the lease. The appellant Palmira McCormick is somewhat more generous when she says:

"We maintain, therefore, that the only indemnity to which the plaintiffs are entitled in this case is a reasonable rent: either that of $300 annually which A. Hartman & Co. received, or that of $960 annually which represents 6 per cent of the value of the 80 acres for the two annual instalments corresponding to 1919 and 1920 subsequent to the existence of the technical bad faith of A. Hartman & Co., that is, from the summoning of the defendant in the action of revendication." (Printed brief of appellant Palmira McCormick, p. 29.)

Let us put aside the mistaken idea that the fruits to be paid by the possessor in bad faith are those which he actually received. A case might occur where the possessor would have the property in a state of complete abandonment and therefore not yielding anything to him and in such case, according to the interpretation suggested by the appellants if there would be no yield from the properties no mesne profits would have to be paid. Scaevola deals with this question thus:

"It might happen that the possessor in bad faith, being convinced of his unfavorable position and fearing that the lawful owner of the property withheld might exercise the action of revendication, would leave the same completely abandoned and uncultivated. In such a case, the fruits to be paid shall include *the total amount of those which might have been produced by the property, regard being had*

*for the conditions prevailing in the agricultural year and the atten- tive care of a good father of a family."*   8 Scaevola, Civil. Code, 485. (Italics ours.)

The rule to be applied in determining the amount to be paid as fruits by the possessor in bad faith is set forth in section 384 of the Civil Code (1930 ed.), which in its per- tinent part provides:

"Section 384.—A possessor in bad faith shall pay for the fruits collected and for those which the lawful possessor might have col- lected, and shall only have the right to be reimbursed for the nec- essary expenses incurred in the preservation of the thing. . ."

As said by Sánchez Román in his *Estudios de Derecho Civil Español,* vol. 3, p. 445, "the doctrine has evidently the character of a civil penalty, whose purpose is to punish the bad faith of the possessor."

Manresa maintains that *"the ones that might have been collected* (referring to the fruits) are those which the thing should have produced."   (4 Manresa, op. cit., p. 259.)

In the case at bar, as we have already stated, the fruits collected by the defendant were the lease rentals paid by Mr. Cautiño, or the sum of $300 annually during the period for which rents and profits are claimed; but the evidence conclusively shows that the yield of the properties while Mr. Cautiño cultivated them during the years in question exceeded $17,000, as we shall see further on in this opinion. If that was the amount which was really produced by the properties there is no doubt that the same represents the value of the fruits which the lawful possessor, plaintiff's predecessor in interest, might have collected.

The lower court did not err in striking paragraphs 3, 4, 5, and 6 of the answer and in our judgment it acted correctly in adopting as the measure of the fruits to be returned the amount which the properties actually produced while in the possession of Mr. Cautiño during the year 1917 and 1920 inclusive.

Now, the appellants urge that the lower court erred in estimating at $26,958.27 the net proceeds of the crops for the years 1917 to 1920 inclusive. In arguing this assignment of error in the printed brief of the appellant Palmira McCormick, p. 31 *et seq.*, it is said that the lower court erred in computing the proceeds of the sugar produced during the years 1917 to 1920, inclusive, on the basis of the list of prices set forth in Exhibit 13 (should be Exhibit 12) of the plaintiffs-appellees, and not in accordance with Exhibit 11, also of the plaintiffs-appellees.

Plaintiffs' Exhibit 11, which begins at page 222 of volume 2 of the transcript of the evidence, is a certificate issued by the Executive Secretary containing a copy of a part of the 34th annual report of the Governor of Puerto Rico, entitled, "Commerce of Puerto Rico 1933–1934, Sugar Exports 1903–1934," which shows the amount of sugar exported from the Island of Puerto Rico from 1903 to 1934, inclusive, together with the price per ton in the New York market. From said Exhibit 11 it appears that the selling price of sugar exported from Puerto Rico during the year 1917 was $110.47 per ton or $5.523 per hundredweight *(quintal);* during 1918, $122.81 per ton or $6.14 per hundredweight; during 1919, $136.77 per ton or $6.838 per hundredweight; and during 1920, $235.88 per ton equivalent to $11.794 per hundredweight.

According to plaintiffs' Exhibit 12 (Tr. of Ev., vol. 3, p. 224), which consists of certain statistics of the Department of Agriculture and Commerce, Division of Statistics, San Juan, Puerto Rico, regarding the average price of sugars from all sources in the New York market, the average price in said market during the years 1917 to 1920, inclusive, was as follows:

| | |
|---|---|
| 1917 | $6.228 per hundredweight |
| 1918 | 6.447 per hundredweight |
| 1919 | 7.724 per hundredweight |
| 1920 | 12.362 per hundredweight |

In our judgment, the lower court committed the error charged. As Exhibit 11 represented the average price of Puerto Rican sugar in New York, and as what was sought to be determined was the selling price of sugar in New York on the dates indicated, there should have been taken as a basis therefor Exhibit 11 and not the average price of all sugars sold in the New York market to which Exhibit 12 refers. It is evident that Exhibit 11 shows more accurately than Exhibit 12 the price of the sugar produced by plaintiffs' properties during the four years in question. The appellees argue that the price paid by the central to the growers (*colonos*) is the average price of sugar in the New York market; but as we have statistics showing what was the average selling price of sugar from Puerto Rico, such statistics doubtless represent the true price received by Mr. Cautiño. Of course, since this evidence was presented by the plaintiffs-appellees themselves, in applying it against them, we have accepted it as correct for it is to be presumed, and of this we have no doubt, that if said evidence were not correct, the appellees would not have presented it.

According to the prices set forth in Exhibit 11, the gross income received from the sugar in question would be:

| Year | Hundredweight of sugar | Price por Hundredweight | Gross Income |
|---|---|---|---|
| 1917 | 1,804.60 | $5.523 | $9,996.81 |
| 1918 | 2,046.80 | 6.140 | 12,567.35 |
| 1919 | 1,835.40 | 6.838 | 12,550.15 |
| 1920 | 1,888.60 | 11.794 | 22,274.15 |
| Total | | | $57,358.77 |

According to the average New York price which the lower court erroneously applied, the result was as follows:

| Year | Hundredweight of sugar | Price por Hundredweight | Gross Income |
|---|---|---|---|
| 1917 | 1,804.60 | $6.228 | $11,239.05 |
| 1918 | 2,046.80 | 6.447 | 13,195.72 |
| 1919 | 1,835.40 | 7.724 | 14,175.63 |
| 1920 | 1,888.60 | 12.362 | 23,346.87 |
| Total | | | $61,957.27 |

The difference between the average price of all sugars sold in New York and the average price of the sugar from Puerto Rico in the same market amounts to $4,598.50; but as the lower court erred in estimating the gross income for the year 1919 at $14,176.63, instead of $14,175.63, which is the correct amount, we must deduct from the judgment the sum of $4,599.50 that the defendants-appellants were improperly adjudged to pay.

The appellant Palmira McCormick also urges that the lower court erred in not deducting from the gross income the amount of 25¢ per hundredweight of sugar on account of packing, freightage and insurance to the New York market, which the central deducted from the price paid to the grower.

The appellees argue that the charge of 25¢ per hundredweight was included in the production expenses as to which Mr. Cautiño testified.

The appellees are not correct. The expenses to which Mr. Cautiño referred did not include the 25¢ for packing, freightage, and insurance of the sugar. From the testimony of Mr. Cautiño we take the following:

"Q. The maximum expenses, Mr. Cautiño, during the year 1918, not in the 18 but in the 17?

"A. Then the expenses were less, from 80 to 90 dollars.

"Q. 80 or 90 dollars for what, per acre?

"A. Per acre.

"Q. If we fixed at 90 dollars the maximum which you have mentioned, could we be avoiding all possibility of mistake as to including the total expenses in the maximum amount per acre?

"A. I think so.

"Q. Ninety dollars per acre. Mr. Cautiño, what expense items do you include in those total expenses?

"A. The item of cultivation.

"Q. What else?

"A. Weekly expenses.

"Attorney Soto Gras:

"Q. How is that, I do not understand, cultivation?

"A. Cultivation, the overseer I kept on the estate, his weekly wages.

"Attorney Torres:

"Q. But to what item should the overseer be charged?

"Attorney J. A. Poventud:

"Q. Those expenses, do they include among others. . . ?

"Attorney Soto Gras:

"Q. Overseer, what else?

"A. And all expenses concerning the cultivation of the cane." (Tr. of Ev., vol. 1, pp. 123–124.)

"*　　*　　*　　*　　*　　*　　*

"A. Do you mean how I spent $110 per acre on the 104?

"Q. The only thing I want (even though you do not explain to me what is the total of the expenses of each item) is that you to tell me what are the various items representing that expense.

"A. Breaking up the land, cross plowing it, planting, weeding, irrigation; cultivating the land is breaking it up, making furrows, all that. That is what is called cultivation in raising a crop." (Tr. of Ev., vol. 1, p. 159.)

"*　　*　　*　　*　　*　　*　　*

"Q. Then as I understand now that you have answered one of my questions, the $110 for cultivation does not include the expenses of harvesting, cartage, and transportation?

"A. No, sir.

"Q. It does not include that?

"A. No, sir.

"Q. So that those supplemental expenses must be added to the $110 for cultivation?

"A. No, the cutting of the cane. . .

"Q. Is it different?

"A. And the cartage, that is included in this estimate of $110. The cutting of the cane and the cartage are included in that.

"Q. And the harvesting?

"A. The harvesting is the cutting and transportation to the railway switch (*chucho*).

"Q. Then, all that is included?

"A. $110.

"Q. Is everything included in the $110?

"A. Yes, sir.

"Q. Since the hauling began until you delivered the cane at the Central Machete?

"A. No, at the railway switch because from the Tuna to the Central Machete the transportation is by rail for which the central pays at 41 cents per ton." (Tr. of Ev., vol. 1, pp. 168–169.)

From the above transcribed testimony it is clearly evident that Mr. Cautiño had not in mind the deduction of 25¢ on account of packing, freightage, and insurance, it appearing on the contrary, that he referred to the expenses of planting and cultivation, including cartage.

Taking into account the number of hundredweight produced from 1917 to 1920, the amounts to be deducted for packing, freightage, and insurance should be as follows:

| Year | No. Hundredweight of sugar | Total to be deducted for packing, freight and insurance |
|---|---|---|
| 1917 | 1,804.60 | $451.15 |
| 1918 | 2,046.80 | 511.70 |
| 1919 | 1,835.40 | 458.85 |
| 1920 | 1,888.60 | 472.15 |
| Total | | $1,893.85 |

As a possessor in bad faith is entitled to have deducted from the fruits which he must return the amount incurred by him in producing them (sec. 382, Civil Code, 1930 ed.), it is also proper to deduct from the amount of the judgment the sum of $1,893.85.

The appellant Palmira McCormick further urges that the court erred in computing the expenses for cultivation, etc., per acre, in which Mr. Cautiño incurred for producing the crops pertaining to the years 1917 to 1920, inclusive. The court fixed those expenses at $35,000. However, the testimony of Mr. Cautiño shows exactly the amount expended by him in the cultivation of the 70 acres which according to him, he cultivated out of the 80 contained in the two properties of the plaintiffs-appellees. From his testimony the following appears:

| Year | No. of acress | Expenses per acre | Total |
|---|---|---|---|
| 1917 | 70 | $110 | $7,700 |
| 1918 | 70 | 110 | 7,700 |
| 1919 | 70 | 110 | 7,700 |
| 1920 | 70 | 210 | 14,700 |
| Total | | | $37,800 |

See the transcript of the evidence, vol. 1, pages 156, 158, 159, 160, 166, 168, and 169.

As the amount which the court deducted on account of expenses from the gross proceeds was $35,000, and said expenses actually amounted to $37,800, there is a difference of $2,800, which also must be deducted from the amount of the judgment. Deducting then from the $26,958.27, the amount of the judgment, the sum of $4,599.50 to which we have previously referred, on account of the difference between the New York market price of sugars from all sources and that of sugar from Puerto Rico, plus $1,893.85, representing the charge of 25¢ for packing, freight, and insurance which the court failed to deduct and to which we have already referred, plus the $2,800 difference in the production expenses, the amount of the judgment should be reduced to $17,664.92, in lieu of the $26,958.27 granted in the judgment appealed from.

█ Regarding the attorney's fees, we have no doubt that the same should be allowed. The record is a bulky one; the transcript of the evidence consists of three volumes, the first of which covers 507 pages, the second 317, and the third 523; the holding of the trial as we have already stated at the beginning of this opinion, took the following days: March 23, September 11 and 12, October 11 and 25, November 8 and 29, December 13 and 20, 1935, and January 24 and 31, 1936; the questions raised are truly important and the professional standing of counsel for the appellees is excellent. However, we are of the opinion that the sum of $7,000, regard being had for all the circumstances surrounding this case, is somewhat excessive and that the same should be reduced to $5,000.

For the reasons stated the judgment appealed from should be modified by reducing the amount thereof to $17,664.92 and the item of attorney's fees to $5,000, and as so modified the judgment is affirmed.

Mr. Justice Wolf concurs for the most part in the opinion, but not in the amount of rents and profits granted which he thinks should be reduced.